UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| VALENTINA DYSHKO, et al., | ) | CASE NO.  5:08cv587 |
| | ) | |
| Plaintiffs, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| vs. | ) | |
| | ) | |
| TIMOTHY SWANSON, et al., | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | [Resolving Doc. 54] |
| | ) | |

This matter comes before the Court on Defendants' Motion for Summary Judgment ("Motion") (Doc. 54).  The Court has been advised, having reviewed the Motion, Response in Opposition ("Opposition") (Doc. 74), Reply (Doc. 76), and all supporting documentation, as well as applicable law.  For the reasons set forth herein, Defendants' Motion is denied.

I.      **Factual Background**

Valentina Dyshko (Mrs. Dyshko) is a resident of Lake Township, Ohio, who immigrated to the United States from Ukraine.  She speaks little to no English.  At the time that the events giving rise to this action occurred, Mrs. Dyshko homeschooled her two youngest children.  When the local school district concluded that her homeschooling paperwork was incomplete, Stark County issued a warrant for her arrest on the misdemeanor charge of contributing to the delinquency of a minor.  Defendants[1] contend that the County made several attempts to serve this warrant on Mrs. Dyshko, but that Mrs. Dyshko's husband Pavel (Mr. Dyshko) refused service.  Mr. and Mrs. Dyshko (Plaintiffs) argue that they received only one notice, to which Mrs. Dyshko responded by reporting to the Stark County Sheriff's Office.  However, the parties do not suggest that this disputed fact is material to the issues at hand.

---

[1] Defendants are the Board of Commissioners of Stark County (which the Court is treating simply as Stark County) and the Stark County Sheriff, Timothy Swanson, in his official and personal capacities.

On Friday, March 10, 2006, at 1:30 p.m., Mrs. Dyshko, accompanied by her English-speaking son Stanislav, reported to the Stark County Sheriff's Office in response to the final notice from Stark County and turned herself in on the "no bond" misdemeanor warrant. Two deputies placed Mrs. Dyshko under arrest, handcuffed her, and removed her from the waiting area and the company of Stanislav into the jail. The deputies were entirely unable to communicate with Mrs. Dyshko. According to Defendants, the only non-English speaking detainees with whom the Sheriff's Office was prepared to communicate were Hispanic detainees, for whom the Sheriff's Office maintains an on-staff interpreter and a Spanish version of the prisoner rule book.

In response to the language barrier, the sergeant on duty, Denise Prusacik, first consulted with an officer who spoke Polish.[2] However, the officer and Mrs. Dyshko could not communicate. Defendants contend that Corrections Officer Jeff Begue then unsuccessfully attempted to contact someone at a local Ukrainian church.[3] Later, Officer Begue contacted his mother-in-law, Irene Bednar, who spoke Ukrainian, and informed her that they needed a Ukrainian translator. Tel. Trans. at 4.[4] Sergeant Prusacik decided that she would use Bednar as an interpreter. Sergeant Prusacik[5] asked Bednar, "[Y]ou have skills that I may need?" *Id.* at 5. Bednar stated, "Yeah, I speak Ukrainian." *Id.* On that basis alone, they proceeded, and Sergeant

---

[2] There is no indication in the record that anyone attempted to contact the court from which the misdemeanor warrant issued once it was apparent that communication with Mrs. Dyshko would be an issue or to contact Sheriff Swanson. There is also no indication in the record that any thought was given to the issue of informing Mrs. Dyshko of her rights, including her right not to speak to the deputies.

[3] Defendants remark in their Motion that a copy of the telephone conversation with the Ukrainian church is attached to the Motion as Exhibit B. However, Exhibit B contains only the recordings of the telephone calls with Irene Bednar, who ultimately attempted to interpret for Mrs. Dyshko. The Court found no other evidence in the record of any attempt to contact a Ukrainian Church.

[4] Defendants attached the transcription of the telephone call in which Bednar offered her translation skills as Exhibit B to their Motion. (Doc. 69-2). The Court will refer to the transcription as "Tel. Trans.," and will cite the page numbers of the original transcription, rather than the compilation page numbers.

[5] The transcription identifies Sergeant Prusacik merely as "female voice." Tel.Trans. at 4. However, it is clear from Sergeant Prusacik's deposition that she interacted with Bednar on the phone.

Prusacik asked Bednar to inquire of Mrs. Dyshko whether she was suicidal and whether she had a heart condition. *Id.* She further informed Bednar that Mrs. Dyshko had turned herself in on a warrant and that she would be staying at the jail the entire weekend and reporting to court on Monday. *Id.* Sergeant Prusacik also told Bednar that the doctor who would decide whether to put Mrs. Dyshko on suicide watch was not present at the jail and would need to know from Bednar whether Mrs. Dyshko reported being suicidal. *Id.* at 5-6.

Having spoken to Mrs. Dyshko, Bednar reported that she "said she wants to kill herself." *Id.* at 7. "I said, do you want to hurt yourself? And she says, yeah. Then I said, do you want to die? And she said, I certainly do want to die." *Id.* at 7-8. Thereupon a nurse began communicating with Bednar and asking her to inquire about Mrs. Dyshko's medical condition and about why Mrs. Dyshko wanted to commit suicide. *Id.* at 9-10. After speaking again with Mrs. Dyshko, Bednar reported to the nurse that Mrs. Dyshko refused to respond to her question about the method by which she wanted to die. *Id.* at 10. Bednar made one final attempt at communicating with Mrs. Dyshko in order to determine whether she had medical conditions. She ascertained that Mrs. Dyshko had "trouble with her heart" and "trouble with her blood, and once in a while her head hurts." *Id.* at 11. After some further discussion between Sergeant Prusacik and Bednar, the conversation ended. *Id.* at 14.

In a subsequent conversation with Bednar on March 10, an unidentified male officer asks her to inquire of Mrs. Dyshko about her place of birth and her employment status, as well as basic contact information. *Id.* at 19-20. Bednar tells the officer that she has been in the United States for thirty-three years and that there is "stuff [she has] forgotten," presumably referring to her ability to speak Urkainian. *Id.* at 20. However, the conversation proceeds, Bednar speaks with Mrs. Dyshko, and then she conveys some basic information to the male officer. *Id.* at 21-

22.  She then resumes her conversation with Mrs. Dyshko, which is punctuated with "I don't understand," and is concluded by Bednar's telling the male officer, "I did not understand a word she said."  *Id.* at 22.  Finally, a "female voice," presumably Sergeant Prusacik, talks with Bednar and asks that she tell Mrs. Dyshko that she is being put on suicide precaution and that she needs to hand the officers all of her clothing, including her underclothes.  *Id.* at 24.  At that point, Bednar specifically requests to talk with Mrs. Dyshko one more time because, as she put it, "[W]hen she was talking to me she was crying and when she said she wanted to kill herself – so, you know, I remember my mom saying stuff like that.  It's the emotion [inaudible]."  *Id.* at 25.  Sergeant Prusacik informed Bednar that it was too late to second-guess the original conclusion: "[O]nce the doctor was told, then the decision was made . . . And we can't – we can't change it now . . .  [W]e would rather treat her for a cold than a suicide."  *Id.* at 25-26.

After another discussion with Mrs. Dyshko, Bednar reported to the male officer the phone number Mrs. Dyshko had given her and indicated that she had told Mrs. Dyshko about the suicide precautions and the need for her to give the officers her clothes, but she was not sure that Mrs. Dyshko had understood her.  *Id.* at 27-28.  She then asked Mrs. Dyshko what medications she was taking, to which Mrs. Dyshko apparently responded that she was taking Agrylin.  *Id.* at 30-31.  Several other issues were discussed with Mrs. Dyshko, including her need to call off work and her desire to call home and find out if her children were safe, as well as whether she was a United States citizen (which she told Bednar she was not).  *Id.* at 36-38.  The phone call then ended.

The depositions in this matter indicate that Mrs. Dyshko was taken to an unoccupied cell where a female officer ordered her to remove her clothes.  The officer apparently remained in the cell with Mrs. Dyshko as she undressed.  Mrs. Dyshko complied with the instructions except that

4

she did not remove her underclothes at once, and the officer had to communicate to her that she needed to do so.  The officer then gave Mrs. Dyshko the standard suicide gown, which Plaintiffs contend lacked proper fastening mechanisms.  Apparently, throughout this process Mrs. Dyshko was crying.

Later in the weekend, Mrs. Dyshko was taken to an office within the jail to receive a phone call from her sister and a contemporaneous call from the Ukrainian Embassy.  As Mrs. Dyshko juggled the telephones and held one to each ear, the suicide gown began to slip from her shoulders and fall down, exposing her breasts.  The female officer in closest proximity to Mrs. Dyshko attempted to help her hold up the gown, but a male officer walked by just at that moment and gave a surprised utterance at Mrs. Dyshko's exposure.

Throughout the weekend, Mrs. Dyshko remained in isolation as part of the suicide precaution, and she was given no shoes to wear unless she was transported from her cell to another part of the jail.  She complained of being cold for the entire weekend.  While she was visited by the jail psychologist[6] on March 11, 2006, around 8:00 a.m., at which time he approved the continuation of her suicide precautions, she claims that she missed three doses of Agrylin, the medication that she had identified in her conversation with Bednar, which was provided to the jail by her family and which she required to keep her high platelet count under control and to prevent blood clots.[7]  Defendants contest this claim.

Mrs. Dyshko was released on Monday after her court appearance.  She complains now of frequent headaches and a general depression that has affected her ability to enjoy her family and

---

[6] There is no indication in the record that the jail psychologist was able to communicate with Mrs. Dyshko verbally.
[7] According to Mr. Dyshko, the family attempted to provide the medication to the jail, but the jail refused it, informing the family that it had its own medication.  P. Dyshko Dep. at 14.  However, Mrs. Dyshko repeatedly stated that no medication was given to her over the period of three scheduled doses.

her everyday activities.  Both Mr. and Mrs. Dyshko allege that her treatment in the Stark County Jail has changed their lives and resulted in emotional distress and interruption of daily activities.

## II.      Applicable Legal Standard

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c). The court is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986).  The court views the evidence of record and draws all reasonable inferences in the light most favorable to the nonmoving party.  *LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).

Summary judgment is appropriate if the party that bears the burden of proof at trial does not establish an essential element of its case.  *Tolton v. Am. Biodyne, Inc*., 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson*, 477 U.S. at 247-48 (Emphasis in original).  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Id.* at 248.  Summary judgment should be denied if "a reasonable jury could return a verdict for the nonmoving party."  *Id*.

## III.     Analysis

Plaintiffs have brought claims against Stark County and Sheriff Swanson, in both his official and personal capacities, as follows:

6

1.    Claim against Sheriff Swanson and Stark County for a violation of Mrs. Dyshko's rights under the Fourth and Fourteenth Amendments, by means of 42 U.S.C. § 1983;

2.    Claim against Sheriff Swanson and Stark County for a failure to train and supervise the officers at the Stark County Jail, resulting in a violation of Mrs. Dyshko's rights, privileges and immunities, by means of 42 U.S.C. § 1983;

3.    Claim for loss of consortium on behalf of Mr. Dyshko;

4.    Claim for intentional infliction of emotional distress on behalf of Mrs. Dyshko.

Am. Compl. at 8-10.  Defendants contend that they are entitled to summary judgment on all of Plaintiffs' claims, and further that Sheriff Swanson is entitled to qualified immunity on those claims brought against him in his individual capacity.

**A.    § 1983 claim for violation of constitutional rights**

Mrs. Dyshko alleges that her treatment while at the Stark County Jail violated her right to due process of law as well as her right to be free from both cruel and unusual punishment and the invasion of her privacy.  She also alleges that Defendants violated her right to receive her medications in a timely manner.  Finally, she alleges that Defendants' lack of a policy for addressing the needs of a detainee in her situation was unreasonable and constitutes deliberate indifference.

In their Motion, Defendants argue that none of Mrs. Dyshko's constitutional rights have been violated by Stark County or by Sheriff Swanson.  First, they claim that no Fourth Amendment right to privacy attaches in this case, as no general right to non-disclosure of personal information exists, and any claim of a violation of her right to privacy in her body is defeated by the fact that only a female officer was present when Mrs. Dyshko was required to remove her clothes and don a suicide gown.  Second, they argue that Mrs. Dyshko's due process rights were not violated during her time at the Stark County Jail because she has no

7

constitutional right to an interpreter during intake and because the jail acted reasonably in determining that she posed a suicide risk.

As an initial matter, if Plaintiffs intended to name Sheriff Swanson in his official capacity as part of their claims under § 1983, that is the equivalent of naming Stark County. *Kentucky v. Graham*, 473 U.S. 159, 169 (1985).  Therefore, only the claims against Stark County and against Sheriff Swanson in his individual capacity are at issue.  To the extent that Sheriff Swanson is named in his individual capacity, that claim is subject to a qualified immunity defense, which will be taken up in due course herein.[8]

Section 1983 provides in pertinent part as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  A municipality cannot be held liable under § 1983 for the actions of its employees pursuant to the doctrine of *respondeat superior*.  *Monell v. Dept. of Social Servs.*, 436 U.S. 658, 691 (1978); *Board of County Comm'rs v. Brown*, 520 U.S. 397, 403 (1997).  Instead, a municipality may be held liable only if a plaintiff can show that a constitutional violation occurred as a result of the municipality's policy or custom.  *Brown*, 520 U.S. at 403 (citing *Monell*, 436 U.S. at 691).

When a pretrial detainee is confined, his constitutional rights must be balanced against the institution's interests in maintaining security and order.  A pretrial detainee may be confined according to the rules of a penal institution so long as those rules and conditions do not violate

---

[8] The claims against Sheriff Swanson in his personal capacity in both of Plaintiffs' § 1983 claims are similar, and are both subject to a qualified immunity defense.  Therefore, after the Court has addressed the § 1983 claims with respect to Stark County, it will take up the qualified immunity question in a separate section of its analysis.

the detainee's constitutional rights or amount to punishment, as the detainee has not yet undergone an adjudication of guilt. *Bell v. Wolfish*, 441 U.S. 520, 535-36 (1979). "[I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Id.* at 539.

The first question posed by Defendants' Motion is whether the constitutional protections cited by Plaintiffs attach in a situation of pretrial detention. While the protections against cruel and unusual punishment under the Eighth Amendment do not specifically attach to a pretrial detainee, those same protections are guaranteed a pretrial detainee through the due process clause of the Fourteenth Amendment. *Johnson v. Karnes*, 398 F.3d 868 (6th Cir. 2005) (citing *Estelle v. Gamble*, 429 U.S. 97, 101-02 (1976)).

"The applicability of the Fourth Amendment turns on whether 'the person invoking its protection can claim a "justifiable," a "reasonable," or a "legitimate expectation of privacy" that has been invaded by government action.'" *Hudson v. Palmer*, 468 U.S. 517, 525 (1984) (quoting *Smith v. Maryland*, 442 U.S. 735, 740 (1979). The Supreme Court has held that a pretrial detainee is guaranteed a limited privacy interest under the Fourth Amendment. *Bell*, 441 U.S. at 558. When a pretrial detainee alleges a violation of that limited privacy interest, a court must consider whether the violation was reasonable, which involves the consideration of the following factors: "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.* at 559.

The officials at the Stark County jail based their decisions with respect to Mrs. Dyshko upon Bednar's assertion that Mrs. Dyshko said she was suicidal. However, it appears that Mrs. Dyshko never told Bednar that she was suicidal. According to the translation provided by Olga Shosdachuk, the interpreter hired by Defendants to interpret the deposition of Mrs. Dyshko,

Bednar asked Mrs. Dyshko, "Do you want to do something with yourself?"  *See* V. Dyshko Depo. at 50.  Shosdachuk then translates Mrs. Dyshko's response as follows:  "Why would I want to die?  I want to go to my kids.  Word for word, why would I die? I want to go back to my kids."  *Id.*  Furthermore, Bednar began to doubt her interpretation of Mrs. Dyshko's words, and she specifically told the officer in authority that she wanted to talk to Mrs. Dyshko again to see whether she had understood her correctly, a fact that Defendants do not dispute.  However, Sergeant Prusacik did not allow that communication, and informed Bednar that the determination regarding suicide precautions had already been made.  It is upon this decidedly shaky ground that jail officials processed Mrs. Dyshko, whose only connection to the English-speaking world– namely her son Stanislav, who is reportedly fluent in English—had not been permitted to remain with his mother during the booking and medical pre-screening process.

Plaintiffs have argued that Bednar had no medical training and was therefore unqualified to make any determination as to Mrs. Dyshko's propensity to commit suicide.  *See* Am. Compl at 6-7.  Defendants address that argument in the Motion, and counter that the jail psychologist— and not Bednar—made that determination.  *See* Motion at 9.  However, the Court would note that a reasonable jury could find the actions surrounding that determination violated Mrs. Dyshko's substantive due process rights and were unreasonable.  The jury could conclude that a relative of an official at the jail spoke Ukrainian only very infrequently (and not recently), and was enlisted—with very limited preliminaries—to translate for a detainee whom the jail was unequipped to process.  This translator, who was speaking to Mrs. Dyshko over the phone, repeatedly failed to understand Mrs. Dyshko and then misinterpreted the very question upon which the doctor would later base an opinion.  Apparently, jail officials intended that this communication would constitute the pre-screening process.  The initial misinterpretation was

conveyed via telephone to the jail psychologist who, never having seen Mrs. Dyshko, determined that she should be placed on suicide precaution, which required her to strip naked in front of a female guard and wait in isolation, wearing an ill-fitting suicide gown, until the psychologist's Saturday morning visit.  Even when the psychologist visited her on Saturday morning (after she had undergone being placed on suicide watch and all that it entailed), there was still no way for him to communicate with Mrs. Dyshko.  There is no indication in the record that jail personnel made any attempt to locate an interpreter who could translate for the psychologist and permit him to make anything more than a visual assessment, on the basis of which he determined she should spend the rest of the weekend on suicide precaution.

Moreover, although Mrs. Dyshko told Bednar that she took Agrylin for a blood disorder, she contends that no one gave her the medication until she had already missed three doses.  One of Defendants' witnesses, Chief Deputy McDonald, testified that the pre-screening process could not be completed with Mrs. Dyshko because of the language barrier.  McDonald Depo. at 19-20.

Plaintiffs have adduced evidence that Stark County issued a bid description for a health provider at the jail that later resulted in a contract between Stark County and Correctional Health Care Group (CHCG).  Stump Depo. at 108; McDonald Depo. at 17.  For nearly nine years, the contract provided, among other things, that CHCG would operate under the standards promulgated by the National Commission on Correctional Health Care (NCCHC), and would seek accreditation from that organization.  Stump Depo. at 122-23.  Those standards provide as follows:  "Arrangements should be made for an interpreter or an assistive device whenever effective communication is compromised due to speech, hearing, or language deficits.  Selection of the interpreter or form of assistance should consider the patient's needs and abilities."  Ex. 7 to Pl. Opp. (Doc. 74-8 at 2).

11

On January 26, 2006, Stark County entered into an agreement with CHCG in which it agreed to extend for an additional ninety days the contract already awarded to CHCG.  (Doc. 74-7 at 2).  This extension was to last from February 1, 2006 through April 30, 2006, which includes the dates of the events giving rise to Mrs. Dyshko's claims.  *Id.*  The extended agreement acknowledged that the provisions of the original agreement would remain in full force.  *Id.*

However, Jonathan Stump, the director of CHCG, stated in his deposition that the Stark County Jail was never accredited at any time during his tenure.  Stump Depo. at 122.  Sergeant Prusacik clearly stated that no policy existed for obtaining interpreters to conduct pre-screening of non-English, non-Spanish speakers.  Prusacik Depo. at 7.  Sheriff Swanson was entirely unable to point to any policy adopted by the Stark County Jail for providing interpreters upon intake.  Swanson Depo. at 10-12, 34-37.  It is apparent from a review of the record that the officials at the jail could not communicate with Mrs. Dyshko, and that therefore the pre-screening process, upon which rest a detainee's health and well-being while at the jail, could not be completed.  *See* McDonald Depo. at 19-20 (Doc. 57 at 6).

While a municipality may not be held liable on a theory of *respondeat superior*, it may be held liable when a decisionmaker who possesses authority to establish municipal policy makes a deliberate choice to follow a particular course of action.  *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986).  In this case, Sheriff Swanson had authority from Stark County to delegate the duties in the jail, including the promulgation of jail policies.  Swanson Depo. at 8, 69.

An analysis of the *Bell* factors set forth above clearly requires this Court to deny summary judgment on these facts.  Most glaringly deficient is the justification for this intrusion upon Mrs. Dyshko's privacy rights: a jury may reasonably conclude that the intrusion had little or no justification because it occurred as a result of a haphazard approach to protecting the rights

12

and safety of a pretrial detainee who is not conversant in the English language, and it was ultimately based upon an egregious error.  The analysis of the remaining factors flows from that conclusion.  The scope of this intrusion upon Mrs. Dyshko's privacy rights is far broader than was justified.  Suicide precaution was unnecessary, and forcing Mrs. Dyshko to disrobe in front of an officer and spend a weekend in isolation was likewise unnecessary and traumatic.  Likewise, the manner in which the officials conducted this intrusion was unwarranted.  Mrs. Dyshko had no idea what was happening around her, why she was being stripped of her clothing, why she was forced to wear a suicide shift that was perpetually on the verge of slipping from her shoulders, and how long she would be required to remain in the jail.  As no competent interpreter was available to explain these things to her, jail officials simply compelled her to comply with their orders but could not communicate their reasons.  She could not communicate with the doctor, whose conclusions were based upon a faulty premise, nor could she make known to the nurses her anxiety about her missed doses of medication.  Finally, while jail officials did make an effort to keep the entirety of the jail population from witnessing the process of having Mrs. Dyshko change into the suicide shift, there is no overcoming the fact that Mrs. Dyshko did have to strip completely naked—without justification—in front of another person, and spend several days attempting to protect her modesty in a jail setting with male guards present, all the while having no ability to communicate.

Given the largely undisputed facts of this case, the Court finds that Mrs. Dyshko's § 1983 claim against Stark County must proceed to trial.  A jury should have an opportunity to evaluate the facts and determine whether Defendants' actions were in fact reasonable, or whether the lack of any policy for attempting to find interpreters led to violations of Mrs. Dyshko's Fourth Amendment right to privacy, as well as and her substantive due process rights under the

Fourteenth Amendment, which were compromised not only by the loss of her privacy but also by the failure of the jail to provide her medications as a result of the inability to complete the pre-screening process.

**B.      § 1983 claim for failure to train**

Plaintiffs next bring a claim under § 1983 for failure to train the personnel at the Stark County Jail.  They allege that no policy existed within the jail for conducting suicide pre-screening of non-English speakers, and that this failure to promulgate a policy amounts to failure to train or supervise the employees at the Stark County Jail. Defendants argue in their Motion that none of Mrs. Dyshko's constitutional rights were violated, and that, even if her rights were violated, no evidence has been produced that such a violation was substantially certain to occur or that Defendants' actions in the face of such certainty amounted to deliberate indifference.

In the *Monell* decision, the Supreme Court held as follows:

> [A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Monell*, 436 U.S. at 694.  The Court later clarified that decision in holding that liability could arise not only in the case of an unconstitutional policy, but also when a constitutional violation occurred as a result of the municipality's failure to train its employees.  *City of Canton v. Harris*, 489 U.S. 378, 387 (1989).  "[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  *Id.* at 388.  Moreover, the Court noted that "[i]n resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform."  *Id.* at 390.

14

The Sixth Circuit recognizes two possible avenues for demonstrating deliberate indifference as a result of a failure to train.  On the one hand, a plaintiff may set forth prior instances of unconstitutional conduct that demonstrate that the municipality has known of and ignored a history of abuse, and that it "was clearly on notice that the training in this particular area was deficient and likely to cause injury."  *Plinton v. County of Summit*, 540 F.3d 459, 464 (2008) (quoting *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005)).  Alternatively, a plaintiff may demonstrate a "failure to provide adequate training in light of foreseeable consequences that could result from a lack of instruction." *Ellis ex rel. Pendergrass v. Cleveland Mun. School Dist.*, 455 F.3d 690, 700-01 (6th Cir. 2006) (quoting *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999)(internal quotation marks omitted)).

While Defendants have stressed the impracticality of having a translator available for every conceivable language that they may encounter in the Stark County Jail, the Court cannot overlook the fact that no policy existed outlining a method for protecting the rights of anyone in Mrs. Dyshko's situation.  As discussed above, one of the contract provisions between Stark County and CHCG was the requirement that CHCG obtain accreditation from NCCHC, whose standards included the requirement that interpreters be made available to communicate with inmates whose communication abilities are hindered by a language barrier or hearing problems.

A situation in which a non-English, non-Spanish speaker comes into the jail is entirely foreseeable, as is the need to protect that detainee's physical safety and her constitutional rights. Other than Defendants' assertion that the jail attempted to contact a Ukrainian church (*see supra* at n.2), the record reflects no attempt by jail personnel to find an objective party—someone other than a relative of a jail official—to help Mrs. Dyshko, nor is there any evidence that any protocol

15

(policy, custom or otherwise) existed to outline or direct any such an attempt, which a jury may reasonably find amounts to a failure by Stark County to train jail officials.

The jail officials' unguided last-minute effort to communicate with Mrs. Dyshko resulted in a miscommunication that a jury may reasonably find cost Mrs. Dyshko her privacy and substantive due process rights.  The Court finds that the failure to provide a policy for the processing of non-English, non-Spanish speaking detainees may reasonably be seen by a jury as deliberately indifferent to a foreseeable need.[9]   Further, a jury may reasonably find that this failure resulted in a direct injury to Mrs. Dyshko, including a violation of her substantive due process rights, as outlined above.  For that reason, summary judgment is denied as to Stark County on Plaintiffs' failure to train claim under § 1983.

C.     Qualified immunity

A governmental official performing a discretionary function is entitled to qualified immunity in his personal capacity when his actions (or failure to act) do not violate a clearly established constitutional right.  Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (citing *Harlow v. Fitzgerald*, 457 U.S. 800 (1982)).  Under *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court held that the qualified immunity analysis required two steps, analyzed in the following order:  first, the court must inquire whether a constitutional right would have been violated on the facts alleged; second, if a violation is established, the court must consider whether the specific right was clearly established.  *Id.* at 200.  Recently, the Supreme Court held that the

---

[9] Exhibit 8 to Plaintiffs' Opposition to the Motion for Summary Judgment demonstrates the demographics of Stark County as of 2000.  (Doc. 74-9).  Stark County Jail is not a small municipal jail.  It is a jail that serves a county consisting of nearly 400,000 people.  A jury could reasonably conclude, based upon the size of Stark County and the demographics as demonstrated by Plaintiffs, that the jail should have foreseen this eventuality and been prepared to process such a non-English, non-Spanish speaker.

16

foregoing analysis could be conducted in any order.  *Pearson v. Callahan*, 129 S. Ct. 808, 818 (January 21, 2009).

Actions of a government official with respect to a citizen that "shock the conscience" offend substantive due process.  *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).  The Supreme Court has acknowledged that the deliberate indifference analysis is fact-intensive, and that "[d]eliberate indifference that shocks [the conscience] in one environment may not be so patently egregious in another."  *Lewis*, 523 U.S. at 850 (citing *Rochin v. California*, 342 U.S. 165, 172-73 (1952)).  Equating the substantive due process analysis with that of procedural due process, the Court stated that the application of the concept of substantive due process

> is less a matter of rule.  Asserted denial is to be tested by an appraisal of the totality of facts in a given case.  That which may, in one setting, constitute a denial of fundamental fairness, shocking to the universal sense of justice, may, in other circumstances, and in the light of other considerations, fall short of such denial.

*Id.* (quoting *Betts v. Brady*, 316 U.S. 455, 462 (1942)). The Court explained that the ability of prison officials to deliberate regarding their treatment of a pretrial detainee (contrasted with a situation admitting of little or no deliberation) makes a difference in the analysis of what shocks the conscience.  *Id.* at 851.

In the same way, the Sixth Circuit has held that

> [i]n situations wherein the implicated state, county, or municipal agent(s) are afforded a reasonable opportunity to deliberate various alternatives prior to electing a course of action (such as, for example, most occasions whereby corrections officials ignore an inmate's serious medical needs), their actions will be deemed conscience-shocking if they were taken with 'deliberate indifference' towards the plaintiff's federally protected rights.

*Claybrook v. Birchwell*, 199 F.3d 350, 359 (6th Cir. 2000) (quoting *Lewis*, 523 U.S. at 852-53).

In the instant case, the jail officials, who were acting without any policy to guide them, made some attempt to address the situation they faced with Mrs. Dyshko.  Sheriff Swanson knew

17

that a requirement existed within the contract with CHCG that the jail be accredited according to NCCHC standards, and he had deliberately chosen to waive that requirement.[10]  *See* Stump Depo. at 122.  During his deposition, Sheriff Swanson stated that having foreign language interpreters available for those in Stark County who speak a foreign language and might undergo intake at the jail was similar to "having a policy to deal with aliens being from outer space." Swanson Depo. at 37.  According to Swanson, the mere possibility of the Stark County Jail's interacting with these non-English speaking people does not necessitate his having a policy to address such instances in order to protect those detainees' rights.  *Id.*  Therefore, despite the clearly worded NCCHC standards that contemplate a situation such as this one, Sheriff Swanson chose not to prepare his officers with a generic policy for non-English speakers.

That decision by Sheriff Swanson resulted in a series of actions by jail officials that violated Mrs. Dyshko's substantive due process rights, including her rights to medical care, privacy, and substantive due process, as described above.

Had Mrs. Dyshko been able to communicate with jail personnel and had they concluded, based upon successful communication, that she required monitoring for suicidal ideations, a weekend of suicide precaution would not be shocking.  But, according to Defendants' own interpreter, she did not require any such monitoring.  A reasonable jury could conclude that this entire circumstance could have been avoided if a policy existed within the jail for attempting to obtain foreign language interpreters when the need arose.  However, in light of Sheriff Swanson's declaration that the occasional foreign language speaker resembles a space alien whose existence in Stark County does not require his attention or the promulgation of a policy, Mrs. Dyshko's claims are particularly shocking.

---

[10]  When asked why the jail was not accredited according to NCCHC standards despite the requirements in the contract, Mr. Stump stated that "[t]he sheriff doesn't believe in it [accreditation]."  Stump Depo. at 122.

It strikes the Court as entirely unreasonable that it should turn a blind eye to the first – or second, or third – non-English-speaking detainee who enters the Stark County Jail and is shuffled into an isolation cell for stripping and suicide precautions because the jail did not have any direction or policy from its sheriff for processing that detainee.  Therefore, the Court finds that qualified immunity should be denied to Sheriff Swanson, and that the claims against him in his personal capacity should proceed to trial for determination by a jury.

>    **D.**     **State law claims**

Plaintiffs have raised two additional claims, each under state law.  First, Mrs. Dyshko raises a claim for intentional infliction of emotional distress.  Second, Mr. Dyshko claims a loss of consortium as a result of Mrs. Dyshko's experience in the Stark County Jail.  The Court will address both claims together.

Under Ohio law, a plaintiff claiming intentional infliction of emotional distress must show that

>    (1) the defendant intended to cause emotional distress or knew or should have known that its conduct would result in serious emotional distress to the plaintiff; (2) defendant's conduct was outrageous and extreme and beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community; (3) defendant's conduct was the proximate cause of plaintiff's psychic injury; and (4) plaintiff's emotional distress was serious and of such a nature that no reasonable person could be expected to endure it.

*Ekunsumi v. Cincinnati Restoration, Inc.*, 698 N.E.2d 503, 506 (Ohio App. Ct. 1997); *see also Yeager v. Local Union 20*, 453 N.E.2d 666 (Ohio 1983).

Viewing the evidence in a light most favorable to plaintiffs, the Court finds that a reasonable jury could find that, as a result of Defendants' actions, not only were Mrs. Dyshko's constitutional rights violated, but she suffered emotional harm, including depression and recurrent headaches, identified by her doctor as stress-related.  Mrs. Dyshko has provided evidence that still she suffers from headaches as a result of this experience, and that her

emotional health has been compromised such that she has a difficult time interacting with her children and her family.  Furthermore, a jury could conclude that the actions of Defendants were beyond the bounds of decency, causing Plaintiff to suffer shame and humiliation without regarding to her rights and with knowledge that they were likely to cause her injury.

A loss of consortium claim consists of three elements:  "1) that the defendant negligently or intentionally caused the injuries of the plaintiff's spouse; 2) that the plaintiff has suffered a loss of consortium and 3) [that] the injuries of [the] plaintiff's spouse have caused the loss of consortium"  *Brockmeyer v. Mansfield Gen. Hosp*., No. CA-2419, 1987 WL 7154 at *3 (Ohio App. 1987).  Mr. Dyshko testified in his deposition to the loss of the companionship of his wife as a result of this incident.  He enumerated the hobbies they had enjoyed together prior to the incident, and reports that, after the incident, she does very few of them and "constantly has headaches."  Mr. Dyshko Dep. at 16-19.  "She spends less time with the kids and she is sad . . . I would say she probably kind of lost her interest to life."  *Id.* at 17.  He added, "And after that incident, constantly hospitals.  Hospitals all the time.  Tests every week."  *Id.*

Defendants have argued that Plaintiffs have not demonstrated an actual injury.  However, the Court finds that Plaintiff has provided evidence of persistent headaches, and that this constitutes sufficient evidence to support a jury's finding of negligence such that Mr. Dyshko's loss of consortium claim may stand.  Moreover, the state law claims against Sheriff Swanson in his individual capacity shall also proceed to trial, as Plaintiffs have satisfied the requirements for overcoming federal qualified immunity.  *See Chappell v. City of Cleveland*, 584 F. Supp.2d 974, 1004-05 (N.D. Ohio 2008) (finding that, because the state qualified immunity standard of recklessness is a jury question, a plaintiff's satisfaction of the federal qualified immunity

20

standard of objective unreasonableness will send the plaintiff's claim to a jury, which can then consider the state qualified immunity recklessness standard).

## IV.    Conclusion

As set forth above, the Court has found that the events at the Stark County Jail are sufficient to permit Plaintiff's § 1983 claims to proceed to a jury.  Consistent with that finding, Plaintiffs' state law claims shall also proceed to trial. Defendants' Motion for Summary Judgment is DENIED.  Furthermore, the Court finds that federal qualified immunity should be denied on all claims against Sheriff Swanson in his personal capacity.

IT IS SO ORDERED.


DATED:  June 2, 2009                              */s/ John R. Adams*_____
                                                 Judge John R. Adams
                                                 UNITED STATES DISTRICT COURT